**CARLTON et al. v. ADAMS et al.**

**No. 12687.**

Court of Civil Appeals of Texas. Fort
Worth.

Oct. 1, 1932.

Rehearing Denied Oct. 29, 1932.

Marshall & King, of Graham, for appellants.

E. G. Thornton, of Olney, for appellees.

DUNKLIN, J.

On June 29, 1928, J. W. Carlton, who then resided in Young county, Tex., made a shipment of 18,500 pounds of wool from Graham, Tex., to Boston, Mass., for sale. As the result of prior negotiations between the parties, the shipment was consigned to Adams & Leland, a partnership firm composed of Samuel G. Adams, Edmund F. Leland, Harry P. Bradford, and Harold M. Cummings, who were engaged in the business of wool commission merchants, selling consignments of wool as agents for shippers on the Boston market for a commission to be paid them by the shipper for their services. The bill of lading issued by the railroad company at Graham named the commission merchants firm of Adams & Leland as consignees and the wool was delivered to them upon its arrival in Boston on July 15, 1928. Attached to the bill of lading was a draft drawn by the shipper upon Adams & Leland for the sum of $5,550, payable to the order of the shipper, and the same was paid by Adams & Leland upon receipt of the wool. That draft was drawn and paid under a prior agreement between the shipper and the consignees that the same would be by way of advancement to the shipper and that the consignees would account to him for any excess over and above the amount of the draft which might be realized from the sale of the wool, and that, should the wool sell for less, then Carlton, the shipper, should pay to the consignees the difference. There was a further understanding between the parties that, after the wool arrived, consignees would advise the shipper as to the best market price that could be realized and get his consent thereto before making a sale. Carlton was a customer of the First National Bank of Graham, and both he and Mr. Bloodworth, the cashier of that bank, as his agent, conducted considerable correspondence with the consignees with respect to the sale of the wool. On August 30, 1928, Mr. Bloodworth, for and in behalf of Mr. Carlton, addressed a letter to the consignees inquiring whether or not the wool had been received and what the same could be sold for. Up to that time the consignees had not acknowledged receipt of the wool.

On September 4, 1928, the consignees addressed a letter to Mr. Carlton, acknowledging receipt of the letter from Mr. Bloodworth, and apologizing for failure to notify him of

the receipt of the wool, and further stating that the shipper's interest had not suffered on account of that oversight because, ever since the wool arrived, the wool market had been very dull, and that there had been practically no call whatsoever for Texas wool; further stating that the shipment was then on the showroom floor, where it would be exhibited to customers, and further stating that the market value of the wool was about 38 cents per pound. On the same date the consignees also wrote to Mr. Bloodworth, calling attention to the letter already written to Mr. Carlton, and with advices to the same effect. In reply to those letters, Mr. Bloodworth and Mr. Carlton both notified the consignees of Carlton's unwillingness to accept 38 cents per pound for the wool. Thereafter there was a further decline in the wool market, during which the consignees tried to induce Carlton to give to them the privilege of selling for the best market obtainable on account of the fact that the market was still declining, and the market price of 36 cents was quoted in some of that correspondence. In reply to those letters, both Carlton and Bloodworth informed the consignees of Carlton's unwillingness to accept less than 44 cents gross, or 42 cents net for the wool. The decline in the market then continued until it reached an average of 25 cents per pound, and the consignees were finally authorized to sell it and did sell it at that price.

After the sale, the consignees demanded of Carlton payment of $2,855.76, difference between the amount they had advanced to him by payment of the draft, drawn on them, to wit, $5,550, and the amount realized from the sale, less freight which they had paid, and their commission of 2 per cent. on the sale; and, upon his refusal of that demand, the consignees instituted this suit against him in the district court of Young county to recover that sum. And, from a judgment awarding plaintiffs that relief, the defendant has prosecuted this appeal.

In addition to a general denial of plaintiffs' cause of action, the defendant filed a plea in reconvention to recover of the plaintiffs the sum of $2,220, as the difference between the $5,550 which he had collected from the plaintiffs on his draft and for which he gave plaintiffs credit, and what would have been realized for the wool had it been sold for 42 cents per pound net to him, or 44 cents per pound less 2 per cent. commission to the consignees. The basis of that cross-action consisted in allegations that, upon arrival of the wool in Boston, on July 15, 1928, its market value was 44 cents per pound, or 42 cents per pound net after allowing a commission of 2 per cent. to the consignees; that, if plaintiffs had notified him of that market value immediately upon receipt of the wool, as they had agreed to do, he would have instructed them to sell at that price, and that they could then have realized 42 cents per pound net to him. There were further allegations that the plaintiffs were guilty of negligence in failing to notify him of such market value of the wool, and that such negligence was a proximate cause of his loss in failing to realize 42 cents per pound for his wool after deducting the freight and commission from the selling price of 44 cents per pound.

Plaintiffs made out a prima facie case for recovery of the amount awarded to them, which was the difference between the amount which they advanced to the defendant and the amount realized from the sale of the wool. It follows, therefore, that the only issues involved upon the trial of this case were those growing out of the cross-action by the defendant against the plaintiffs.

The case was tried before a jury, who, in answer to a special issue submitted to them, found that the plaintiffs were not guilty of the negligence alleged in the cross-action, which the defendant averred was the proximate cause of his failure to realize a net price of 42 cents per pound for his wool. That was the only issue submitted to the jury, and no other issue was requested by the defendant except one presenting the same issue of negligence which was passed on by the jury, in different language, and no complaint is presented here to the refusal of that issue.

■■■ The only assignments of error presented here are to the rejection of testimony of the defendant Carlton and his two witnesses, W. H. Bachellor and D. G. Vick, offered in behalf of the defendant to show the market value of the defendant's wool in the Boston market at the time of its receipt by the consignees. The objection to that testimony which the court sustained was upon the alleged ground that the witnesses had not qualified to give their opinions of such market value. The testimony of all three of those witnesses showed that, prior to the shipment in controversy, they had been engaged in the shipping of wool for sale on the Boston market, and that they and others engaged in a like business in Texas had kept in touch with the Boston wool market through market quotations in the Fort Worth Star-Telegram and other publications, which purported to give daily quotations of that market, and that those market quotations were relied on by such shippers and usually found to be correct. The witnesses further showed that they were familiar with the different classes of wool and the different prices thereof as quoted in those publications. The witness W. H. Bachellor further testified that he made a shipment of wool to the Boston market about the 1st of June, 1928, and that it was sold August 31st of the same year for 44 cents gross, or 42 cents net to him, which was its market value. The witness D. G. Vick testified that on or about the 15th day of July, 1928, the market value on the Boston market

of the kind and character of the wool that he produced on his ranch in Young county was from 42 cents to 44 cents per pound, and that that was the market value of the same kind of wool during the years 1930 and 1931. None of the witnesses had ever been to Boston, and therefore had never seen any sales made on that market. The witnesses Bachellor and Vick both described the kind and quality of the wool which they shipped, but neither of them had ever seen Carlton's wool, and therefore were unable to testify as to its quality and grade; but the defendant Carlton testified that he had seen the wool shipped by both Bachellor and Vick and to which they referred in their testimony, and further testified that his wool was of like quality and even better than the wool shipped by each of those witnesses.

In addition to the objection that the witnesses had not shown themselves acquainted with the market value of wool on the Boston market sufficiently to give expert testimony on that issue, there was a further ground of objection that market value could not be shown by individual sales.

Aside from the prices realized by Bachellor and Vick for their wool, we believe they showed themselves qualified to testify to the market value of the wool of those grades. We believe further that Carlton also qualified to give his opinion as to the market value of his wool, especially in view of his testimony that the same was of the same grade and quality of that shipped by Bachellor and Vick. Hence we conclude that the court erred in excluding the testimony of the defendant and Bachellor and Vick on the question of market values on the ground of lack of qualification. 17 Tex. Jur. pp. 443 and 750 to 752, inclusive.

■ However, the record before us shows that, by agreement of counsel on both sides, all the correspondence between the consignees and the shipper and Mr. Bloodworth, cashier of the First National Bank of Granam, as agent of the shipper, with respect to the shipment and sale of the wool, was introduced in evidence. That correspondence was quite voluminous, consisting of numerous letters and also telegrams. In consignees' letter to the defendant Carlton, of date September 4, 1928, Carlton was told that the market value of his wool at that time was 38 cents per pound, and in reply thereto Carlton wrote to them, from which letter we quote as follows: "Well, as to your price of 38¢ per pound—that is not satisfactory at all. My friend near here—at Palo Pinto, Texas, W. H. Bachellor, has just received 44¢ straight on a carload of wool that he shipped to a competitive firm in your city; practically the same class of wool; though if any difference my wool is better class than his was. * * * I had expected to get 45¢ for this wool. * * *"

On September 11th, for and in behalf of Carlton, Bloodworth wrote the consignees, saying in part:

"We do not feel that the figures of 38¢ would be enough on the wool. * * * Some of our customers shipped to another commission company in Boston and they were paid 44¢ for their wool and we feel like this wool of Mr. Carlton's should bring at least 44¢.

"There has not been much wool in Young County up until the last two or three years, but is increasing each year, so please do not sell the wool for less than 44¢ or the mohair for less than 75¢ without hearing further from Mr. Carlton."

In reply to those two letters, the consignees wrote to Carlton, calling his attention to the continued dull market and the difficulty in finding purchasers for Texas wool, and further stating: "The only comment we can make on the price at 44¢ which your friend at Palo Pinto has just received, is that either his wool for some reason was more valuable than yours, or the transaction took place a long time ago and has only just been reported," and further assuring the shipper that they would make every effort possible to realize the best price obtainable for the wool.

On November 16th Mr. Bloodworth wrote another letter to plaintiffs, requesting that they wire the best price obtainable for Carlton's wool. On November 21st plaintiffs replied to that letter, saying that there was practically no demand for such wool, and further stating: "When a limit of 44¢ was placed on this wool, as we wrote you at that time, it meant taking the wool out of the market, as it was so far above what similar wool could be purchased for in this market at that time," but with further assurances that plaintiffs would make every effort possible to obtain the very best price for the shipment. On November 28th Carlton wrote to the plaintiffs acknowledging receipt of the letter last referred to, addressed to Mr. Bloodworth, and also of one to the same effect addressed to him, containing this further statement: "It seems rather peculiar that D. G. Vick and W. H. Bachellor each shipped carloads of the same wool and at the same time as we shipped our wool, and Mr. Vick's sold in October for 42¢ straight. Our wool is some better than Mr. Vick's and equally as good as Mr. Bachellor's; in fact we had 500 lbs. of five eight weight wool that they had none like. Consequently we will not be satisfied with less for our wool."

On December 4th plaintiffs replied to that letter, repeating statements in their former letter to the effect that Mr. Carlton must have been mistaken in believing that his wool was of like grade or better than the wool for which Vick and Bachellor sold their shipments; and again assuring Carlton that they would do everything possible to get the full

market value for his wool, and would wire Carlton for confirmation before making a sale, with the further statement that it was to the interest of plaintiffs as well as the defendant to realize the highest price possible for the wool. On December 4th Bloodworth, the cashier, wrote plaintiffs a letter requesting them to submit an offer for Carlton's wool, to which plaintiffs replied that they would do their best to get an offer which they could recommend accepting. On December 4th the president of the First National Bank wrote to plaintiffs calling attention to the letter written previously by Mr. Bloodworth and requesting a telegram quoting the market price of Carlton's wool. In answer to that request, plaintiffs wired, saying: "We are offered 37 cents for Mr. Carlton's wool. This is the fullest market value and we advise sale. There is nothing in the situation that makes us think that fine wool can possibly be any higher." In reply to that telegram, the bank wired plaintiffs as follows: "Do not sell Carlton wool at 37 cents," and, upon receipt of that telegram, plaintiffs wrote the president of the bank saying that they would continue their efforts to sell the wool, but further stating that they did not believe it probable that the market would go higher. On March 5, 1929, Bloodworth, the cashier, again wrote the plaintiffs inquiring for what price Carlton's wool could be sold at that time, to which plaintiffs replied by letter, stating that the price had declined below the 37 cents per pound previously offered, and that that price could not then be realized, further saying: "Why don't you let us go ahead and sell the wool for the best price obtainable?" On April 10th plaintiffs again wrote Bloodworth, urging immediate sale of the wool. On May 15th Bloodworth wrote plaintiffs requesting the best bid obtainable for the wool. On June 14th the defendant Carlton wrote another letter to the plaintiffs repeating the statement made in his former letter to the effect that Mr. Bachellor had sold his wool on the same market for 44 cents and that Carlton's wool was the same class as Bachellor's. On June 20th plaintiffs replied to that letter, referring to former correspondence, with further assurance that every effort would be made to realize the best price obtainable, but that there had been a further sharp decline in the wool market. On September 20th Bloodworth again requested plaintiffs to write or wire the best bid possible for Carlton's wool. On September 25th plaintiffs replied to that letter, calling attention to a decline in the market, further quoting 30 to 31 cents as the best price obtainable.

Thereafter several letters passed between the plaintiffs and the defendant Carlton and Bloodworth, and on March 14, 1930, plaintiffs wired the defendant Carlton: "Value your wool here today around 25¢. Can see nothing in future to warrant holding longer. Shall we use our best judgment in selling your wool?" On March 22, 1930, Carlton wrote the plaintiffs again complaining of plaintiffs' failure to sell the wool immediately upon its arrival in Boston, with the further statement: "I had some friends that shipped some cars at the same time to Boston, and one sold his car at 42¢ and the other at 44¢, and they received remittances promptly," but with the further statement: "Under the above conditions, do just as you like about it, as I am sustaining a big loss at this end of the line and I consider that the damage to me was caused by the neglect of your company." On April 22d plaintiffs wrote Carlton stating that the customer who had previously offered 26 cents had withdrawn the offer, but "by splitting the shipment we were able to sell by far the larger part of it at 27¢ and the major portion of the balance at 21¢. We enclose herewith statement of the account, showing balance due us as of today of $2855.76, for which amount we should like to have you send us your check or make some satisfactory arrangement about the payment of this balance due us."

It thus appears that the letters and telegrams quoted above, and which were introduced in evidence by counsel of both parties, contain substantially the same facts as the proffered testimony of Carlton and his two witnesses, Bachellor and Vick, which was excluded upon plaintiffs' objection; and therefore the exclusion of that testimony would not present reversible error. Longenecker v. Ward County Water Improvement District (Tex. Civ. App.) 8 S.W.(2d) 306, and decisions there cited; Ketch v. Weaver Bros. (Tex. Civ. App.) 261 S. W. 380; Matlock v. Glover, 63 Tex. 231; 17 Tex. Jur. p. 443.

Moreover, the primary basis of defendant's allegations that plaintiffs were guilty of negligence in handling the wool was the allegation that, at the time it was received in Boston, its market value was 44 cents a pound gross, and coupled with that allegation was the further allegation that plaintiffs were guilty of negligence in not promptly informing him of that market value when they received the wool on July 15th. By special issue No. 1 the court submitted the question whether or not after receipt of the wool plaintiffs exercised ordinary diligence in offering the same for sale prior to September 4, 1928, and the jury returned an affirmative finding on that issue which was in plaintiffs' favor. The court also submitted special issue No. 2 inquiring whether or not in the usual course of business the plaintiffs within a reasonable time after the receipt of the wool could have found a purchaser for it at a price of 42 cents a pound on the Boston market. However, the court further instructed the jury that they need not answer that issue in the event they had already made an affirmative finding on issue No. 1, and the jury made no finding on issue No. 2. It thus appears that special issue No. 2 was expressly excluded

from the jury as a result of an affirmative finding on issue No. 1, and the defendant did not except to that instruction, and therefore must be held to an approval thereof. Article 2237, subd. 3, Rev. Statutes.

The instruction presenting the issue of negligence was in the nature of a general charge, involving the allegation that, when the wool was received by the plaintiffs, its market value was 44 cents a pound gross, or 42 cents a pound net, and that a person of ordinary prudence would have informed himself of that market quotation, and would promptly have notified the defendant below. However, no objection was made to issue No. 1 on the ground of multiplicity of issues.

In defendant's cross-action there were further issues tendered as follows: That, had the defendant been notified by plaintiffs that the market value of his wool was 44 cents a pound gross, he would have directed them to sell at that price; and that they would have been able to realize that price after receiving such instruction. It cannot be said that the record shows conclusively that defendant would have accepted that price had he been notified, as testified to by him, since, as shown in his letters to the plaintiffs, he believed that his wool was of a better quality than the wool sold by Vick and Bachellor at 44 cents a pound; and the further statement in his letters to the plaintiffs that he thought his wool was worth 45 cents a pound. Pope v. Beauchamp, 110 Tex. 271, 219 S. W. 447; Burleson v. Tinnin (Tex. Civ. App.) 100 S. W. 350 (writ refused) and authorities there cited. Nor can it be said that it was conclusively shown that plaintiffs could have realized 44 cents a pound had they been authorized by the defendant to accept such an offer, since, as shown by plaintiffs' evidence, the market for wool of the grade of defendant's wool was declining all the while, with little demand for wool of that grade, and further that it was exceedingly difficult to find a buyer who would be willing to wait for instructions from an owner to accept an offer; and by reason of that uncertainty plaintiffs repeatedly requested of defendant authority to sell on the open market at the best price obtainable without waiting for instructions from the defendant; and it further appearing that the market price of the wool in question declined from 37 cents to 36 cents a pound before plaintiffs could get a reply from defendant advising a sale at 37 cents.

■■ Those issues are separate from the issue of negligence but supplemental and incidental thereto, and therefore under the doctrine announced in Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084, 1085, a finding in plaintiffs' favor on one or both of those issues will be implied if such findings are necessary to support the judgment rendered. If those issues could be construed as presenting separate and independent grounds of recovery, then they were waived by the appellant under the doctrine of the same case and decisions cited in support thereof, since they were not submitted nor requested to be submitted, and no findings thereon were made by the jury.

■ And it is to be noted further that, even if his pleadings warranted it, defendant's recovery on his cross-action could not have exceeded 6 cents a pound, that being the difference between 44 cents, which he alleges could and should have been realized, and 38 cents, for which he was given an opportunity to sell, and which plaintiffs urged him to accept, but which he refused.

Accordingly, the judgment of the trial court is affirmed.

LATTIMORE, J. (dissenting).

It being shown that the time of shearing is vital, and no evidence being offered to show that Bachellor's wool was sheared the same as Carlton's, I believe Bachellor's testimony was correctly excluded.

I agree with my associates that it was error to exclude the testimony of Vick.

I do not agree that the error was harmless. The introduction of the letters containing hearsay statements about the price brought in sales made by strangers to the suit was inevitable because the correspondence was vital on the dealings between the parties to the suit. That the letters contained statements which might be given improper weight on some other angle of the case and to say that the jury might have so considered such statements is to assume that the jury would do something they had no right to do, and which the record nowhere shows they did do. Original testimony of other individual sales would not have been allowable to prove market value, and I feel we ought not to assume that the fact that such testimony crept in under cover of the history of the transaction will give it respectability, so that the jury would consider it when they ought not to have, and relieve the appellant of his right to present the best and legal evidence. Dallas Consolidated Electric St. R. Co. v. Black, 40 Tex. Civ. App. 415, 89 S. W. 1087; Northern Texas Traction Co. v. Jenkins (Tex. Civ. App.) 266 S. W. 175, 177. The letters nowhere cover the important part of Vick's testimony—the market value as drawn from reading the daily market quotations.

Moreover, those statements were written when their author was not under oath, when his writing of them imports no legal verity, when he was free as far as the penalties of perjury are concerned to make any statement in the letter he chose, whether true or false. The considerations lead me to believe that we cannot say that the letters cure the error complained of.

Neither do I believe that the error is waiv-

ed by the condition of the charge. The appellant makes no complaint, in this connection, with the charge, and is willing to rest his case on it as written, provided he can get his proper evidence to the jury. My brethren say the issue of the appellant's consent to a sale at 44 cents is presumed found against him if auxiliary to the issues submitted, or is waived if an independent ground of recovery.

The court did not make any finding on an "independent issue" not submitted to the jury to write the judgment entered.

The writer believes the case of Ormsby v. Ratcliffe, supra, a valuable contribution to the Texas court law. All that it decided was that a court might not, on independent issues, make a *surprise holding* a "judgment in the face of the issues submitted, and regardless of the findings by the jury." It is interesting that Ormsby v. Ratcliffe was reversed and remanded (not rendered) because the trial court did not require a jury decision of those independent grounds of recovery or defense. But the majority opinion in effect proceeds to *render* this judgment on that holding. They say the error committed would otherwise cause us to reverse this cause, because with that evidence the jury might not have answered in favor of appellant the questions submitted. With that evidence the verdict of the jury might have been for defendant. With such a verdict for appellant in our hands, we would now proceed to enter judgment *against* the appellant because the issue of consent by defendant to a sale at 42 cents a pound is not submitted to the jury. This, it seems to me, is interpreting Ormsby v. Ratcliffe to hold the very thing it forbids.

Let us now take the other angle; namely, that this issue of consent is auxiliary. In such a view, Carlton had in his cross-action *only one ground of recovery*, to wit, the negligence of the appellee. If so much of that ground of recovery as was submitted to the jury had been answered by it favorable to Carlton, as we must assume in this court they would, receiving the evidence improperly excluded, the trial judge could not then make a finding contrary to it on a disputed issue of fact which would have nullified that verdict. Ormsby v. Ratcliffe says such unrequested issue "could not form an independent and original basis for the judgment." "The construction contended for would * * * not only make uncertain jury trials, but in many instances be a denial of a trial by a jury." This evil, thus acutely avoided by the holding in the Ormsby Case, is the very thing my associates unwittingly allow to be visited on Carlton. He would have had a verdict (we assume) with his proper evidence before the jury, but we nullify that verdict by assuming that the court made a finding on an unre-

quested disputed auxiliary issue, which destroyed the effect of the answers of the jury.

The life and vigor of the Ormsby opinion is an unsubmitted issue, *consistent with the issues necessary to recovery and found by a jury*, should be deemed found by the court in such a manner as to support the judgment, but as provided in the statute only in support thereof.

We assume the court made a finding on disputed fact which destroys the verdict we are bound to assume the appellant could have gotten with his evidence properly admitted.

If the most that could have been done in such case is to reverse and remand for another trial, then appellant is being deprived of that other trial by the interpretation of the majority.

The great respect I have for the learning of my associates and my own brief experience in these duties has caused me some doubt as to the propriety of a dissent, but, believing that we face a dangerous trend in the numerous interpretations of Ormsby v. Ratcliffe, I feel impelled to register this dissent.